UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08-CV-225-H

CHURCHILL DOWNS INC., et al                                    PLAINTIFFS

v.

THOROUGHBRED HORSEMEN'S                                    DEFENDANTS
GROUP, LLC, et al

**MEMORANDUM OPINION**

Churchill Downs Incorporated ("Churchill"), Calder Race Course, Inc. ("Calder"), and

Churchill Downs Technology Initiatives Company ("TwinSpires") (collectively, "Plaintiffs")

brought suit asserting antitrust violations and breach of contract claims against Thoroughbred

Horsemen's Group, LLC ("THG"), Kentucky Horsemen's Protective and Benevolent

Association, Inc. ("Ky HBPA"), Rick Hiles ("Hiles"), and Martin A. Maline ("Maline")

(collectively, "Defendants").

Defendants have moved to dismiss the amended complaint on the grounds that the

Plaintiffs lack antitrust standing, that the Interstate Horseracing Act immunizes the Defendants'

actions from antitrust liability, that the Plaintiffs fail to allege sufficient facts under *Bell Atlantic

Corp. v. Twombly*, and that Ky HBPA's actions did not breach the contract between those groups

and Churchill.  Defendants Hiles and Maline also move to dismiss on the grounds that they are

protected by the Volunteer Protection Act.

This litigation occurs in the context of the on-going dispute between the horse owners

and trainers (collectively "horsemen") and racetracks concerning the proceeds from all forms of

off-track betting.  To apply some financial leverage against the racetracks, the horsemen have

withheld their permission for the racetracks to sell the ability for off-track betting operators to accept wagers on the track's races. This antitrust action amounts to the racetracks' return salvo in an escalating war between two groups whose economic destinies are intertwined.

To decide these issues the Court must apply the concepts of antitrust standing and pleading in the unusual context of a federal statute which creates the business of interstate parimutuel wagering. Further, these issues, and analysis thereof, are interrelated, without clear delineations. The Court will address standing, statutory immunity, pleading under *Twombly*, and breach of contract in turn.

## I.

The description of the facts is critical because it helps determine whether an antitrust violation is occurring at all. Regardless of the conclusions Plaintiffs allege, the facts themselves must illustrate the violation. For those reasons, a detailed review of the factual basis of this suit follows.

Churchill is a large racetrack conglomerate that operates both the famous racetrack in Louisville, Kentucky, and the internet-based interstate wagering company TwinSpires. Calder operates a racetrack in Florida. Churchill, as well as other racetracks, earns its revenue largely from pari-mutuel wagering at the racetrack and at off-track betting sites ("OTBs").[1] As an OTB, both Churchill and Calder accept wagers on races run at other tracks. Another form of off-track betting is advanced deposit wagering ("ADW"). An ADW operation is one in which account holders deposit money with an operator for the purpose of making wagers. Account holders

---

[1] For purposes of this opinion, the Court defines "OTBs" as off-track betting sites that do not allow for advanced deposit wagering. Typically then, an OTB is a racetrack such as Churchill or Calder.

make wagers from remote locations via telephone, the internet, or a mobile device.  TwinSpires is an example of an ADW.

In the pari-mutuel wagering system, wagers from all sources are placed together in a pool.  Thus, the bettors wager against each other not against the operator of the pool.  The tracks, ADWs and OTBs return 80% of the pool in the form of "payouts" to the winning bettors.  The remaining 20% is called the "Takeout," which is in essence the profit divided between the OTB or ADW, the host racetrack, horsemen's groups (by way of race purses), and various governmental agencies.

Since 1978 when Congress authorized interstate wagering, OTBs and ADWs must contract with the host racetrack for the right to accept wagers on horse racing at other tracks.  These agreements allow the off-site operators to accept wagers on those races and also to receive a simulcast of the races, referred to as the "signal."  The "price" for the product is the percentage of the Takeout that is paid to the host racetrack and the horsemen's groups.  The current dispute concerns the allocation of the ADW Takeout with regards to the fee it pays for the right to accept wagers on host track races.

OTBs pay the host track a "host fee" for the signal.  ADWs compensate the host track by paying two separate fees: the "host fee" and the "source market fee" (collectively the "Signal Fee").  The host fee is a percentage of the Takeout from wagers made at the OTB or ADW on the races at the host racetrack.  The source market fee is a percentage of all wagers placed by ADW customers who are located near the host racetrack (e.g., within 25 miles).  The source market fee is designed to compensate the host racetrack for wagering that the customers would otherwise have made at the host racetrack.  These fees can vary depending on the popularity of

the racetrack.  In the past, the host track has always entered into a separate agreement with the horsemen's groups governing the percentage of the Signal Fee that is used directly to increase race purses.

In 1978, Congress enacted the Interstate Horseracing Act ("IHA"), primarily to protect the business of smaller racetracks and horsemen's groups from potential interstate off-track wagering abuses.  15 U.S.C. § 3001-07.  Essentially, the IHA required that to engage in the business, industry participants must cooperate.  Of particular interest here, the IHA requires five (5) consents to approve any off-track wagering agreement:  (1) the authorized horsemen's group, (2) the host racing association,[2] (3) the host state racing commission, (4) the off-track racing commission, and (5) all currently operating tracks within 60 miles of the off-track betting office, or, if there are none, then the closest such track in an adjoining state.[3]  15 U.S.C. § 3004.  The horsemen's group is defined as "the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day."  15 U.S.C. § 3002(12).  Thus, only the authorized  horsemen's group at the host track can provide the required consent.  A horsemen's group at another track has no ability to provide the statutory consent.  Refusal to consent is commonly referred to as a "horsemen's veto."

Two horsemen's groups, Ky HBPA and Kentucky Thoroughbred Association, Inc. ("KTA"),[4]  represent the owners and trainers at Churchill Downs.  Until recently, Churchill obtained Ky HBPA and KTA's consent to negotiate with OTBs and ADWs to sell Churchill's

---

[2] The host racing association is the host racetrack.  15 U.S.C. § 3002(9).

[3] The host racing commission and off-track racing commission's consents are governed by state law.

[4] KTA and KTA Executive Director David L. Switzer were formally parties to this lawsuit and have subsequently been dismissed by agreement of the parties.

signals.  Churchill then negotiated contracts with OTBs and ADWs.  Churchill presented these contracts to Ky HBPA and KTA, which the horsemen's groups could veto on an individual basis. The horsemen's groups have consented to Churchill exporting the signal for the Kentucky Derby, the Kentucky Oaks, the Kentucky Derby Trial, the Woodford Reserve Turf Classic, and the Breeders' Cup Event Day races to any OTB or ADW and the horsemen's groups only reserve the right to veto four of those contracts.  Churchill pays the horsemen's groups, by way of purses, 51% of the price Churchill receives for the signal.[5]  This is the "Purse Share."  The contracts stipulate that Churchill cannot export the signal for any other races without the horsemen's groups' consent, which the IHA requires.

In November 2007, horsemen's groups from many tracks formed the Thoroughbred Horsemen's Group, LLC ("THG").[6]  These horsemen's groups authorized THG to negotiate a separate but uniform Horsemen's Simulcast Licensing Agreement (the "Licensing Agreement") with each ADW.  The Licensing Agreement sets a uniform fee by requiring ADWs pay THG a "License Fee" equivalent to at least one-third of the Takeout.[7]  It also provides that THG member horsemen's groups would consent to the sale of the host signal only if the ADW signed

---

[5] The purses receive 51% of the post-tax Signal Fee revenue.

[6] Horsemen's groups at over 40 tracks, which account for more than 65% of wagering on thoroughbred horseracing in the United States, have joined THG.  The alliance includes the Arkansas Horsemen's Benevolent and Protective Association, the Delaware Thoroughbred Horsemen's Association, the Florida Horsemen's Benevolent and Protective Association, the Indiana Horsemen's Benevolent and Protective Association, the KTA, the Ky HBPA, the Louisiana Horsemen's Benevolent and Protective Association, the Maryland Thoroughbred Horsemen's Association, the Minnesota Horsemen's Benevolent and Protective Association, the Mountaineer Park Horsemen's Benevolent and Protective Association (in West Virginia), the Ohio Horsemen's Benevolent and Protective Association, the Oklahoma Horsemen's Benevolent and Protective Association, the Pennsylvania Horsemen's Benevolent and Protective Association, the Tampa Bay Downs Horsemen's Benevolent and Protective Association, the Texas Horsemen's Partnership, the Thoroughbred Owners of California, and the Virginia Horsemen's Benevolent and Protective Association.

[7] The Licensing Agreement would create a contractual obligation for the ADW to pay THG.  The License Fee would be allocated through THG to the horsemen's groups directly, bypassing the track entirely.

it.  In this way, THG will contract directly with ADWs, excluding the host tracks entirely.

Defendant THG notes that each THG member would choose whether to join in each separate

Licensing Agreement.  Once signed, the Licensing Agreement's terms would control the

relationship between ADWs and all of THG's member horsemen's groups who also sign it.

Until the ADWs execute the Licensing Agreement, several THG members have vetoed their host

racetracks' attempts to export race signals to all the ADWs.

      The Licensing Agreement does not directly affect the existing relationship between the

tracks and the ADWs, or between the tracks and the horsemen's groups.  The ADWs would

continue to pay the Signal Fee and the tracks would still pay the Purse Share.  For that reason,

the Licensing Agreement provides that the License Fee be reduced by the Purse Share.  In this

way, the benefit the horsemen's group and the host track receive are intertwined.

      By requiring execution of the Licensing Agreement, the horsemen's goal is to ensure a

minimum allocation from the Takeout.  Nevertheless, the ADW may negotiate distribution of the

remaining funds as it chooses.  One, the ADW can continue to pay the host racetrack the current

Signal Fee.  In this scenario, the ADW would then pay THG directly the difference between the

License Fee and the Purse Share.[8]  Two, the ADW could renegotiate the Signal Fee with the host

racetrack such that the Purse Share of the Signal Fee would itself equal 1/3 of the Takeout.

Either way, the ADW would pay a higher price for the signal than it currently pays, so long as

the Purse Share is not already 1/3 of the Takeout.  The Licensing Agreement effectively

precludes an ADW from negotiating to buy that signal for less than 1/3 of the Takeout.

      In October 2006 Churchill entered into contracts with both KTA and Ky HBPA, which

---

[8] This presumes that the current Purse Share is not equal to or greater than 1/3 of the Takeout.

continued their past dealings.  Once Churchill obtained contracts with several ADWs and OTBs, however, KTA and Ky HBPA refused to give their consent.  KTA and Ky HBPA continued to exercise their horsemen's veto through 2008, while every ADW refused to enter into the Licensing Agreement.  Even though Churchill and Calder did negotiate new contracts with several ADWs for a higher Signal Fee, KTA and Ky HBPA withheld their consent because none of the ADWs would sign the Licensing Agreement.  Additionally, the FL HBPA has vetoed Calder's attempts to sell its signal to ADWs.  Calder's dispute with the FL HBPA has caused several other horsemen's groups to revoke consent for their track to sell its signal to Calder.[9] Due to Florida law, the revocations prevent any Florida OTB or ADW from accepting wagers on any race not simulcast at Calder.[10]

In the midst of all this public controversy, on April 24, 2008, Churchill filed this federal lawsuit.  One consequence of the ongoing dispute has been Churchill's decision to reduce its purses in the midst of its 2008 spring meet.  Defendants claimed that the purse reductions violated the contracts between KTA and Ky HBPA and Churchill.  In response, the horsemen immediately filed their own motion for a preliminary injunction to prevent Churchill from reducing purses.

On June 16, 2008, the Court held a full day hearing on the horsemen's request for injunctive relief.  After hearing all the arguments, the Court issued an opinion from the bench denying the injunctive relief.  The Court denied the relief because it was unclear from the

---

[9] The horsemen's groups who have withdrawn their consent include the Delaware Thoroughbred Horsemen's Association, the Ky HBPA, the Maryland Thoroughbred Horsemen's Association, and the Ohio Horsemen's Benevolent and Protective Association.

[10] Florida law permits off-track wagering within the state only on race signals that are imported by Florida tracks presently hosting live races, which at this time only includes Calder.

evidence whether Churchill had breached its contractual duty to consult and because the

damages, if any, did not appear to be irreparable.  Shortly thereafter, Defendants filed the

currently pending motions.

## II.

The Sherman Act states, "[e]very contract, combination in the form of trust or otherwise,

or conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations, is declared to be illegal." 15 U.S.C. § 1.  The Act only forbids unreasonable restraints on

trade.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Courts determine whether a restraint is

unreasonable using either the *per se* rule or the rule of reason.  *Bassett v. Nat'l Collegiate*

*Athletic Ass'n*, 528 F.3d 426, 432 (6th Cir. 2008).  To analyze the claims here, one must

understand the theoretical and factual basis for the antitrust allegations.

The complaint presents one theory of antitrust violation: price-fixing perpetrated by a

group boycott.  Plaintiffs pleaded a "*per se* violation of Section 1 of the Sherman Act" because

"various horsemen's groups have contracted, combined and conspired to raise the amounts they

receive from advanced deposit wagering" and that the horsemen are engaging in "an unlawful

group boycott of racetrack operators" in order to accomplish this objective.  (Am. Compl. ¶ 1.)

A more specific outline of Plaintiffs' argument follows.[11]

_____

[11] Defendants obviously characterize the facts and claims in a different light.  They deny that the
horsemen's groups can be engaged in a group boycott because the horsemen's groups do not compete against one
another for the sale of signals.  Defendants say that the horsemen's groups play no role in controlling the pricing of
the signals because the Ky HBPA contract with Churchill states that Churchill and the ADWs will establish the
signal price.  In fact, Defendants contend that the horsemen's groups cannot be appropriately viewed as sellers of
signals since they only provide their consent to the racetrack, which independently negotiates the signal sale.
Further, Defendants deny that horsemen's groups can be considered competitors since each horsemen's group only
has the power to withhold their consent from their respective racetrack's sales.

Their characterization focuses on describing the horsemen's groups actions as merely ensuring the
horsemen's groups' allocation of the revenues from ADW wagering.  In so focusing, the Defendants attempt to
divorce the allocation of revenues from the price of the signal, despite the Licensing Agreement's fee structure,

In November 2007, Ky HBPA allied with THG, agreeing to a uniform policy with horsemen's groups at 40 other racetracks.  (Am. Compl. ¶¶ 63-64.)  Plaintiffs allege that the following concerted action amongst competitors.[12]  KTA, Ky HBPA, and three other named horsemen's groups appointed THG to negotiate on their behalf.  The Ky HBPA, the Pennsylvania HBPA, Florida HBPA, and the Texas Horsemen's Partnership have all stated in letters that they will not consent to the sale of the host track's signal unless the ADW signs the Licensing Agreement.  THG members have vetoed racetrack attempts to sell their signals to ADWs that have not signed the Licensing Agreement.  THG's member groups each exercise their separate vetoes collusively to create the boycott and effectuate their plan.

Plaintiffs say that the horsemen's groups control the signal price by refusing to allow its sale unless each ADW agrees to pay the specified percentage of the Takeout to the horsemen.  Defendants do not directly set the minimum price at which the host track can sell its signal, but the Licensing Agreement does set a minimum purchase price for the ADW.  According to Plaintiffs, ADWs are no longer able to freely negotiate to purchase the signal at the lowest price possible.  When every horsemen's group collectively withholds the consent from all host racetracks to send signals to a particular ADW, Plaintiffs say their action constitutes a group

which explicitly entwines revenue allocation with the Signal Fee.  Finally, Defendants dispute whether a group boycott exists because Plaintiffs did not identify a target of the boycott and claim that the only potentially injured party would be the ADWs, who do not compete with the horsemen's groups.

[12] Plaintiffs allege that the horsemen's groups are at least indirectly competing with each other through their host racetrack.  They explain that the host racetracks compete with each other to get ADWs, and other OTB operators, to buy their signal.  Accordingly, the racetracks have an interest in selling their signal to as many OTB or ADW operators as possible, for the best price possible.  The horsemen's groups benefit from this by way of their purses.  Since they must consent to the sale of the signal, Plaintiffs contend that they are a party to the sale.  Plaintiffs further contend that the horsemen's groups and tracks are actually joint sellers of the right to accept wagers on races since both must consent to the contracts.  In that respect, the horsemen's groups may also be seen as direct competitors in their joint seller capacity.  *See* Section VI for additional discussion of how the horsemen's groups participate in the market for signals.

boycott, which raises prices and limits competition.  As a result, market forces alone no longer determine the lowest signal price.

## III.

The Clayton Act gives a right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).  Those making antitrust claims face heightened standing requirements.  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449, 450 (6th Cir. 2007).  Thus Plaintiffs must not only show the Article III requirements of injury-in-fact, causation, and redressability, but must also show that the injury is an antitrust injury.[13]  *Id.* at 449.  Dismissal for failure to show antitrust standing is appropriate at an early stage.  *Id.* at 450.   In reviewing such a motion, the Court draws all reasonable inferences in favor of the plaintiff.  *DirecTv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

To address standing, the Court assumes that an antitrust violation occurred and then determines whether Plaintiffs are "person[s] injured by reason of a violation of the antitrust laws."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528-29 (1983) (*see also Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 616 (6th

---

[13] As a threshold requirement, Plaintiffs must have Article III standing.  Article III standing requires the plaintiff allege that he or she has suffered an actual injury, that is fairly traceable to the defendant's conduct, and that can likely be redressed by a favorable decision by the court.  *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  Plaintiffs do not have standing if it is purely speculative whether their injury resulted from Defendants' conduct or whether it resulted from decisions made by third parties.  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976).  Churchill and Calder's injuries, the inability to sell their signals, result from the collective behavior of the horsemen's groups and ADWs, who are not defendants in this lawsuit.  However, Plaintiffs do provide indication that if the Court removed the obstruction caused by the antitrust violation, Churchill and Calder could sell their signal to ADWs.  Similarly, the allegations indicate the tracks would sell signals to Twinspires.  Since the complaint alleges that Churchill and Calder have negotiated contracts for the 2008 season with several ADWs, which Defendants have vetoed as part of the alleged antitrust violation, remedying that violation could result in the contracts being approved.  Plaintiffs provide the Court sufficient support to conclude that in this case victory would be substantially likely to result in Churchill and Calder being able to sell their signals to ADWs and Twinspires being able to purchase signals.  Plaintiffs have Article III standing based on an alleged loss of wagering opportunities and an increased signal price caused by supposed anti-competitive behavior.

Cir. 2001) (holding no antitrust injury and dismissing for lack of standing under analysis that assumed arguendo that defendant violated the Clayton Act)).[14]  The antitrust standing analysis "evaluate[s] the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Id.* at 535.

A private antitrust plaintiff must plead an antitrust injury, which ensures that any "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *NicSand*, 507 F.3d at 449 (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344 (1990)).  The Sixth Circuit requires the plaintiff show "(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions."  *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989).  The Court will analyze each.

### A.

The first factor focuses on the nature of the injury.  The complaint must allege an anticompetitive effect on competition, i.e. the market, not merely the competitors themselves. *Bassett*, 528 F.3d at 434.  The Sixth Circuit has previously held that "paying higher prices for a product due to a lack of competition in the market" is a potential antitrust injury.  *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2002).  The Supreme Court has also found that a reduction of output can be "proof of actual detrimental effects" on competition.  *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986).

---

[14] Defendants' arguments regarding the application of the "rule of reason" and *per se* rule to the alleged violation are misplaced with regards to standing.  That analysis is properly applied to determine whether an antitrust violation occurred since both standards assess whether the restraint on trade is unreasonable.  *See Bassett*, 528 F.3d at 432.  Since standing is determined under the assumption that Plaintiffs have pled an antitrust violation, analysis regarding the existence of a violation is irrelevant.

For purposes of standing analysis, the Court must assume two things: that the facts in the complaint to are true, and that Plaintiffs' antitrust theory is supported by facts that actually amount to antitrust violations.[15]  Plaintiffs' antitrust theory is price-fixing perpetrated by group boycott.  The group boycott is the horsemen's groups' agreement, through THG, to veto any sales of signals to ADWs absent a Licensing Agreement.  The group boycott produces a detrimental effect when the horsemen's groups prevent signals from being sold, which results in fewer wagering opportunities for the ultimate individual consumer.

The Licensing Agreement sets a minimum cost of the signal that is higher than any ADW currently pays.  Plaintiffs further allege that current pending contracts with ADWs, although not consented to yet, provide for higher fees than the ADWs paid in previous years.   The Sixth Circuit has previously indicated that paying higher prices for a product due to a lack of competition causes harm to competition.  The Supreme Court has also recognized the harm to competition a reduction of output causes.  Since fewer signals are available for purchase, resulting in fewer wagering opportunities, and prices are inflated because the group boycott prevents competition in the sale of signals, the complaint alleges harm to competition.  Thus, the allegations appear to satisfy the first element of antitrust standing.

**B.**

The second factor requires the Plaintiffs' alleged personal injury be "attributable to an anticompetitive aspect of the practice under scrutiny."  *Nicsand*, 507 F.3d at 451 (quoting *Atl. Richfield Co.*, 495 U.S. at 334 (internal quotations omitted)).  That is to say that the "plaintiff

---

[15] The Court will directly address the issue of the nature of the an antitrust violation in Section VI of this opinion.

must allege that the antitrust violation is *either* the 'necessary predicate' for its injury *or* the only means by which the defendant could have caused its injury." *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 900.  "[D]ismissal is warranted only where it is apparent from the allegations in the complaints that the plaintiffs' injury would have occurred even if there had been no antitrust violation." *In Re Cardizem CD Antitrust Litigation*, 332 F.3d at 914.  The defendant's legal action must be "independent of the alleged antitrust violation, which was the actual indisputable, and sole cause of the plaintiff's injury" to warrant dismissal. *Id.* at 914.  Thus, causation can be found where Plaintiffs allege the violation caused the injury and no evidence of an independent, non-violative cause exists.

Plaintiffs' specific injury is three-fold: (1) Churchill and Calder's inability to sell their signal, (2) the consequential decrease in wagering opportunities, and (3) a higher price to Twinspires, an ADW, to purchase the signal.  The anti-trust violation causes these specific injuries.  Price-fixing raises TwinSpires's cost of the signal.  That price increase may lower the revenue Churchill and Calder receive.  The group boycott also decreases the number of ADWs purchasing the signal, thereby reducing wager revenue to Churchill and Calder.  It also reduces the wagering opportunities Twinspires can provide.

Although each horsemen's group could individually veto signal sales thereby causing similar injuries to tracks and ADWs, that behavior is not independent and separate from the alleged collusion.  Since no independent lawful cause of the injury can be identified, Plaintiffs meet the second element of antitrust standing.

**IV.**

The Court next addresses whether the enactment of the Interstate Horseracing Act (the

"IHA") creates a legislative immunity from antitrust liability under the Sherman Antitrust Act. Defendants argue that because the IHA authorizes their individual actions, it impliedly repeals Sherman Act liability and immunizes them from liability for any collective action. Indeed, Congress can preclude application of antitrust laws either by (1) explicitly stating such preclusion, or by (2) so regulating the substantive area that preclusion must be implied. *Credit Suisse Sec. LLC v. Billing*, 551 U.S. 264, 127 S. Ct. 2383, 2389 (2007). Neither party argues that the IHA does this explicitly. No court has addressed whether the IHA does so impliedly. This is a difficult issue because the IHA occupies such an unusual place within the business of parimutuel wagering.

Courts are cautioned that implied immunity is disfavored, *Gordon v. New York Stock Exch.*, 422 U.S. 659, 682 (1975), because "if exceptions are to be written into the [Sherman] Act, they must come from the Congress, not [the] Court." *U.S. v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 561 (1944). Implied immunity "can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *U.S. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 422 U.S. 694, 719 (1975). It should be narrowly construed and only be found if necessary to make another federal law work. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979); *Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963).

## A.

Both parties agree that *Credit Suisse* sets the general ground rules for determining implied immunity in this case. The Supreme Court set out a number of factors that determine whether the securities laws were "plainly repugnant" to the antitrust laws, thus requiring immunity. *Credit Suisse*, 127 S. Ct. at 2392. Because *Credit Suisse* dealt with a hedge fund and

securities laws, it is not directly applicable here.  Nevertheless, its principles are instructive.

In *Credit Suisse* and in all the other cases where the Supreme Court has found immunity, Congress has created a statutory and regulatory structure that actively controlled and monitored behavior or the participants within a particular substantive area.  *See Credit Suisse*, 127 S.Ct. at 2389; *Brown v. Pro Football, Inc.*, 518 U.S. 231, 242 (1996) (federal labor laws); *Gordon*, 422 U.S. at 682 (Securities and Exchange Act of 1934); *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694 (1975) (Investment Company Act of 1940); *Silver*, 373 U.S. at 358-59, 364 (Securities Exchange Act of 1934); *U.S. v. Borden Co.*, 308 U.S. 188, 198 (1939) (Agricultural Marketing Agreement Act of 1937).  In each of these circumstances, the comprehensive regulatory scheme was deemed a substitute for antitrust regulation.  In addition, the regulatory scheme was seen as likely to produce conflicting guidance from antitrust laws or to conflict directly with regulatory practices.  *Credit Suisse*, 127 S.Ct. at 2389.  Thus, the regulatory schemes confer implied immunity by providing alternative methods for supervising the regulated activity.

The IHA is an unusual piece of legislation.  Its provisions created the rules under which racetracks could legally market and facilitate inter-state horse race wagering.  It requires consents from various parties before any track can sell its signal or before any wagering can occur.  But the legislation neither creates nor envisions any other supervision or regulatory scheme.  Its limited provisions do not seem to conflict either directly or indirectly with antitrust principles. In fact, regulation of the horse wagering industry is left to the respective state racing commissions.  The Sixth Circuit seems to agree, given its passing assessment that the IHA envisions a lack of government regulation and interference. *Ky. Div., Horsemen's Benevolent &*

-15-

*Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414-15 (6th Cir. 1994) (holding that the IHA is a constitutional exercise of Congressional power.)

In all the cases above, the Supreme Court found implied immunity from the antitrust laws because Congress had, in effect, substituted rigorous and pointed regulation. Moreover, it did so in highly regulated areas where the regulatory function appeared less certain and where nothing in the statute indicated a purpose justifying immunity. *See Silver*, 373 U.S. at 358-59, 364. The IHA's legislative framework suggests that antitrust immunity should not be implied here.

## B.

Defendants argue that implied immunity may apply even where active supervision is absent. The Sixth Circuit has in fact found implied immunity in at least one arguably less regulated situation which Defendants liken to ours. *See McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399 (6th Cir. 2006). The Tennessee Valley Authority ("TVA") is a federally-chartered corporation that is charged with "maintaining and operating the properties now owned by the United States . . . in the interest of the national defense and for agricultural and industrial development." 16 U.S.C. § 831. Electrical cooperative members challenged the legality of contracts between the TVA and the electrical cooperatives. *McCarthy*, 466 F.3d at 403. The Sixth Circuit held that TVA was immune from antitrust liability related to these contracts because the statute created municipal monopolies for electrical power, which was at odds with concerns about competition. *Id.* The Court also said that the statute specifically authorized the activity at issue. *Id.* at 414. Finally, the Sixth Circuit recognized that the actions were performed by a semipublic entity, and indicated that additional supervision could exist. *Id.*

-16-

at 414, n.25.[16]

The TVA represents a unique situation, as it is a quasi-governmental entity, wholly owned by the U.S. government. *Id.* at 403, n.2. In fact, the TVA is treated as an agency and evaluated under the Administrative Procedures Act. *Id.* at 406. The contracts at issue were approved by that agency board. *Id.* State law further regulates the TVA rates. *Id.* at 414. The combination of federal authority and state regulation created a regulatory scheme of sorts, and the scheme applied to the process of rate determinations and contract formation. *Id.* at 414. Applying antitrust laws would be completely at odds with that scheme. *Id.*

The IHA has a much more limited purview. Its purpose is to ensure that horsemen are compensated for their contributions to the successful operation of an off-track betting system. 124 Cong. Rec. 31,552, 31, 554. That purpose seems neither at odds with nor inhibited by antitrust laws. The IHA provides no such standards or oversights to regulate the horsemen's veto. The horsemen's groups have neither a public purpose nor a federal charter. Thus, the close nexus between the claims in the TVA case, and government control and involvement in that industry are simply not present here.

For all these reasons, the Court declines to use *McCarthy* as a launching pad to expand

---

[16] Defendants cite no other convincing authority to support this avenue of argument. The Fifth, Tenth, and Eleventh Circuit have found implied immunity arising from the Amateur Sports Act ("ASA"). *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000); *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 526 (10th Cir. 1989); *JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1231 (11th Cir. 2006). The ASA authorizes the United States Olympic Commission ("USOC") "to recognize one national governing body ("NGB") for each sport included in the program of the Olympic games." *Jes Props., Inc.*, 458 F.3d at 1229. To be recognized, the NGB must satisfy a number of requirements. *Id.* Although the NGBs enjoy a great deal of autonomy, "the ASA provides for ongoing review of the NGB by the USOC in order to ensure compliance with the ASA." *Id.* at 1229 (citing *Behagen*, 884 F.2d at 528). Not only does the ASA provide for regulatory supervision, but the circuits have rested their finding of immunity on the grounds that the activity at odds with antitrust law is "*necessary to implement Congress' intent.*" *Id.* at 1231 (citing *Behagen*, 884 F.2d at 527) (emphasis in original). For the reasons explained in this Memorandum Opinion, the Court concludes that the antitrust activity alleged here is not so at odds with Congressional intent of the IHA.

the doctrine of implied immunity.

## C.

Defendants must acknowledge the difficulty of comparing the lack of comprehensive regulatory scheme in the IHA with that in other implied immunity cases. So, they make an interesting and nuanced argument–perhaps their best argument. They say that the IHA's proper application confers and, indeed, requires immunity from the antitrust laws. This is so based upon the theory of "extended immunity." The theory posits that if certain concerted action by individuals affiliated in a group is immune from antitrust laws, acts by a group of the groups of individuals must also be immune as well. As applied here, Defendants argue that because individual horsemen cannot comply with both the IHA and antitrust laws, the IHA creates implied antitrust immunity for groups of individuals.[17] Defendants then extend this individual immunity to the horsemen's groups, concluding that groups of the horsemen's groups are also immunized.

Defendants offer three cases to illustrate extending individual immunity to a group. The first two cases involved the Copper-Volstead Act, which regulates agricultural cooperatives. In *Sunkist Growers v. Winckler & Smith Citrus Products*, 12,000 citrus growers joined Sunkist Growers, Inc. and also formed two separate cooperatives: the Exchange Lemon and the

---

[17] Defendants cite *Washington Trotting Ass'n v. Pennsylvania Harness Horsemen's Ass'n* to support the proposition that concerted action amongst individual horsemen could violate antitrust laws. 428 F. Supp. 122 (W.D. Pa. 1977). Although the case holds that individual horsemen acting together could violate antitrust laws, the case did not involve the IHA. *Id.* at 126. At issue was whether one horsemen's group could be recognized as the sole representative of the horsemen at the track. *Id.* at 124. To persuade the track to only deal with one horsemen's group, individual horsemen refused to enter their horses in races. *Id.* at 124-25. The Western District of Pennsylvania concluded that individual horsemen could independently choose not to participate in any track's races, but to do so in concert would violate the antitrust laws. *Id.* at 126. However, the *Washington Trotter Ass'n* case did not involve action under the IHA and this difference is critical. The IHA authorizes only the acts of a group, not an action of any individual.

Exchange Orange.  370 U.S. 19, 21-22 (1962).  The Supreme Court held that these three legal

entities could not be "considered independent parties for the purposes of the" antitrust acts.  *Id.*

at 27.  It reasoned that the Capper-Volstead Act contemplated a "cooperative of such size and

general activities" as the situation in the case.  *Id.* at 29.  The Supreme Court stated that the

configuration of organizations here constituted "in practical effect and in the contemplation of

the statutes one 'organization' or 'association' even though" there were three separate legal

entities.  *Id.*

In *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.*, individual

potato sellers joined two larger grower associations that worked together to bargain collectively

with the potato buyers.  497 F.2d 203, 206 (9th Cir. 1974).  The two bargaining associations had

at least a tacit agreement to secure similar contracts for both organizations' members. *Id.* at 215.

The Ninth Circuit found that the Capper-Volstead Act expressly exempted agricultural

cooperatives from antitrust liability.  *Id.* at 217.  It correctly reasoned that express immunity

protects groups of individuals grouped in cooperatives from antitrust liability as well as

protecting the cooperatives when they act together as one association.  *Id.*

In the third case, *Brown v. Pro Football, Inc.*, the NFL Players Association challenged

collective action on behalf of the NFL Clubs in contract negotiations with developmental squad

players.  518 U.S. 231, 234-35 (1996).  The NFL Clubs agreed on a salary floor for

developmental squad players.  *Id.* at 235.  The Supreme Court reasoned that the implied antitrust

immunity deriving from the federal labor laws applied here as well.  *Id.* at 236, 237.[18]  Such a

---

[18] The Supreme Court has recognized a "'nonstatutory' labor exemption from the antitrust laws," implied from federal labor statutes.  *Brown*, 518 U.S. at 235-36 (citing *Connell Constr. Co. v. Plumbers*, 421 U.S. 616, 622 (1975); *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676 (1965); *Mine Workers v. Pennington*, 381 U.S. 657 (1965)).

conclusion was necessary to "make the statutorily authorized collective-bargaining process work." *Id.* at 237.  The Supreme Court recognized these circumstances as simply a case of multi-employer bargaining under the federal labor laws.  *Id.* at 239.  The case did not involve groups joining together into a larger group of those groups.

Upon examination, however, none of these cases articulates a theory of immunity that is applicable here.  Both *Sunkist*[19] and *Ore-Ida*[20] concerned statutes that provided express immunity.  Where a statute grants express immunity for certain activity and for certain groups, it can provide comprehensive immunity throughout the entire system.  Implied immunity is not comprehensive and requires a different analysis.  In *Brown*, the Supreme Court did not actually extend implied immunity to groups but only held that it applied equally to employees and employers.  To analogize *Brown* to this case would only indicate that any immunity, if found, would apply to both the horsemen's groups and the racetracks or ADWs.

The Court has spent considerable effort to understand this argument in the context of the IHA.  However, the Court ultimately concludes that neither the cases cited nor the particular logic of them provide reason enough to extend antitrust immunity to state horsemen groups exercising their IHA powers in concert.  With all due respect, these arguments actually confuse and conflate several different concepts.  None of these cases support the proposition that implied immunity extends to a group of immune individuals.  In fact, implied immunity doctrine would suggest the opposite conclusion given the fact that immunity is to be implied narrowly and only

---

[19] *Sunkist* does not clearly stand for the principle of extending individual immunity to group activity, but instead seems only to support the premise that legally separate entities may in reality only constitute one entity for purposes of the Capper-Volstead Act.

[20] The Court also notes that *Ore-Ida* only provides non-binding Ninth Circuit precedent, which for the reasons discussed it does not find supportive or persuasive.

to the minimum extent necessary.  *See Silver*, 373 U.S. at 357.

Moreover, to conclude that individual horsemen must be immune from antitrust liability under the IHA misconstrues these circumstances and the statutory scheme.  Individual horsemen do not need immunity because no individual can exercise a horsemen's veto or, for that matter, take any action under the IHA.  Prior to enactment of the IHA, individual horsemen had no right to prevent the tracks from exporting a signal.  The IHA restructured the business of interstate wagering so that an authorized horsemen's group could withhold consent to the track.  Since the horsemen only have a group right, individual horsemen cannot join together to exercise individual consents.  Antitrust law prohibitions on colluding and conspiring do not interfere with each horsemen's group executing its consent power.[21]  This grant of power does not conflict with an antitrust prohibition of concerted action among those groups.

The IHA does not imply immunity for either an individual horseman or a group of them acting as one.  Consequently, there is no implied immunity that the Court could then extend to a group of horsemen's groups, such as THG.  If the IHA granted express immunity to horsemen's groups, then the logic of *Sunkist* and *Ore-Ida* might well extend to a group of groups.  But, the IHA does not provide for express immunity and there is still no individual implied immunity here.  Thus, neither could be extended.[22]

---

[21] Although the Western District of Pennsylvania concluded that some horsemen actions may be antitrust violations, its logic does not extend to this case.

[22] Defendants cite to a decision of Judge Charles Simpson of this district in which he found in open court that the IHA confers implied immunity from antitrust regulation.  TRO Hr'g Tr., 69:16 to 69:21, Choctaw Racing Srvs., LLC v. Ky. Horsemen's Benevolent and Protective Ass'n, Inc., No. 07-237 (W.D. Ky. May 3, 2007) (citing *JES Properties v. U.S.A. Equestrian*, 458 F.3d 1224 (11th Cir. 2006)).  The activity at issue in *Choctaw* was whether an individual horsemen's group's use of its veto with regard to a single OTB violated the antitrust laws.  Compl. ¶¶ 2-3, 33, Choctaw Racing Srvs., LLC v. Ky. Horsemen's Benevolent and Protective Ass'n, Inc., No. 07-237 (W.D. Ky. May 5, 2007).  Judge Simpson concluded that in that circumstance there was clear repugnancy between the IHA and anti-trust laws.  TRO Hr'g Tr., 67:6 to 67:7.  The implied repeal, he said, was the only way to ensure that the

## D.

All of the circumstances where courts have found implied immunity present clear potential for conflict between the antitrust laws and the subsequent law.  Mere incompatibility, as opposed to clear repugnancy, seems insufficient to find implied immunity.  Immunity is only appropriate where the legislature's subsequent legislation would be so contradictory to antitrust legislation, or where attempting to follow both sets of legislation would be so confusing, that the legislature must have intended to repeal the antitrust laws in certain circumstances despite having failed to explicitly say so.  *Credit Suisse*, 127 S. Ct. at 2392.

The facts and statute at hand fall outside such circumstances.  The Court finds no such clear repugnancy between the IHA and the antitrust laws here.  Although Defendants may later show that imposing the antitrust laws would disrupt the intended enactment of the IHA, this is not apparent as a matter of law at this time.  Though Congress clearly intended that a horsemen's group at a racetrack could exercise the statutory veto, it expressed nothing else.  The Court does not find the language to imply a broader authorization or immunization for groups to act in concert.  To so find, would require finding that Congress has so regulated the field that its intent

---

IHA's grant of the horsemen's veto to protect the entire sport of horseracing could work effectively.  *Id.* 68:21 to 68:23, 69:7 to 69:11, 69: 16 to 69:2.

 This Court agrees with the result in these circumstances, but not the analysis.  For the reasons stated in the foregoing section, individual horsemen cannot be liable under the antitrust laws for exercising their IHA veto as part of an authorized group.  Nor can an authorized group be liable for independently exercising its IHA veto right.  Thus, neither an individual nor a group require immunity for their acts under the IHA.  *See also, Hialeah, Inc. v. Fla. Horsemen's Benevolent & Protective Ass'n*, 899 F.Supp. 616, 622 (S.D. Fla. 1995) (holding the IHA provides no antitrust immunity).

 Judge Simpson relied heavily on Congressional intent in reaching his conclusion.  *Id.* 69:2 to 69:6.  He cites to *Hialeah*, 899 F.Supp. at 616 and *Saratoga Harness Racing v. Veneglia*, 1997 WL 135946 (N.D.N.Y. 1997).  *Id.*67:6 to 68:4.  However, *Hialeah* makes a convincing case from the legislative history on the House bill, which stated the "legislation in no way modifies or affects the scope or application of antitrust laws," that the IHA does not provide immunity from antitrust liability.  *Hialeah*, 899 F. Supp. at 621.  *Saratoga* questions that conclusion.  But, the Senate did not make any mention of antitrust concerns and this Court is not persuaded that Congress expressed any intent to apply or repeal the antitrust laws through its enactment of the IHA.

to repeal the antitrust laws is implicit.  *Credit Suisse*, 127 S.Ct. at 2389.  This does not appear to be true.

## V.

Defendants next argue that Plaintiffs' Sherman Act § 1 claim should be dismissed because it fails to state a claim for relief under *Bell Atlantic Corp. v. Twombly*.  550 U.S. 544, 127 S. Ct. 1955 (2007) [hereinafter *Twombly*].  In *Twombly*, the Supreme Court clarified the Rule 8(a)(2) pleading standard by holding that the antitrust complaint must "nudge[] [the] claim[] across the line from conceivable to plausible."  *Id.*, 127 S. Ct. at 1974.  *Twombly* requires that "a plaintiff's allegations, [while] 'assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.'" *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).  *Twombly* established that antitrust complaints are held to a "plausibility standard," which requires Plaintiffs plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.* at 1965.[23]

---

[23] Since *Twombly* expressly disavowed the previous pleading standard set forth in *Conley v. Gibson* courts have wrestled with its appropriate application.  The Sixth Circuit has only addressed the issue of *Twombly's* pleading standard and antitrust litigation in a handful of decisions.  Those decisions do not suggest a departure from the concept of notice pleading, but instead suggest that *Twombly* is best read as clarifying notice pleading.  *See e.g., Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (stating *Twombly* does not require heightened fact pleading); *Ferron v. Zoomego, Inc.*, 276 Fed. Appx. 473, 2008 WL 1988587, *2 (6th Cir. 2008); *Mich. Div.-Monument Builders of North America v. Mich. Cemetery Assoc.*, 524 F.3d 726, 731 (6th Cir. 2008).  The Second Circuit agrees that *Twombly's* plausibility standard does not significantly alter notice pleading.  *Weisbath v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007) (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).  Although the Sixth Circuit has not given such an explicit analysis, at least two Sixth Circuit judges have explicitly stated such an understanding in dissents.  Judge Martin has stated "the key distinction is between a bare-bones complaint asserting only the elements of a claim and a complaint asserting not only legal elements, but also facts to support those elements."  *NicSand*, 507 F.3d at 460 (Martin, dissenting) (dismissed for lack of antitrust standing).  Judge Clay similarly stated, "In other words, Twombly was a case where the plaintiff invoked a statute banning collusion, but failed to actually state any facts suggesting collusion."  *Midwest Media Prop., L.L.C. v. Symmes Tp., Ohio*, 503 F.3d 456, 472 n.3 (6th Cir 2007) (Clay, dissenting) (dismissed for lack of standing under redressability and the overbreadth doctrine).

Under *Twombly*, pleading a § 1 violation cannot merely recite the elements of the cause of action, one must provide facts that support them. *Twombly*, 127 S. Ct. at 1965. Those factual allegations, however, need not be detailed to survive a motion to dismiss. *Id.* at 1964. "[E]ither direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory" is sufficient. *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S. Ct. at 1969). A bare assertion of a conspiracy, however, is insufficient. *Twombly*, 127 S. Ct. at 1966. The facts must give rise to a plausible finding of an agreement that unreasonably restrains trade.

The parties' *Twombly* arguments center on whether Plaintiffs have alleged an actual violation. The Court's analysis as to the existence of an antitrust cause of action is limited to only a determination that such a finding is plausible. Certainly if the complaint supports a finding of a *per se* violation such a finding would be plausible. If the complaint does not provide facts supporting a *per se* violation, the complaint must only provide sufficient facts to make finding a violation under a rule of reason analysis plausible. Full analysis under the rule of reason would not be appropriate at this time given the fact intensive nature of that analysis. The Court will proceed with its analysis under *Twombly* by assessing whether Plaintiffs have pleaded facts that support the elements of an antitrust violation.

A.

Plaintiffs' theory of violation is that Defendants are engaged in a group boycott for the purpose of price-fixing. The pleaded theory is a *per se* violation of antitrust laws because it has such "'predictable and pernicious anticompetitive effect[s], and such limited potential for procompetitive benefit,' that it is conclusively presumed to be unreasonable." *Bassett*, 528 F.3d at 426; *Expert Masonry, Inc. v. Boone County, KY*, 440 F.3d 336, 342 (6th Cir. 2006) (quoting

-24-

*Bailey's, Inc. v. Boone County, KY*, 440 F.3d 336, 342 (6th Cir. 2006)).

Facts that make Plaintiffs' theory plausible, even though not conclusive, would meet the *Twombly* pleading standard. The question is only whether Plaintiff has pled sufficient facts to support finding price-fixing. Plaintiffs must allege three elements to sustain a § 1 cause of action: (1) the existence of a contract, combination, or conspiracy (2) affecting interstate commerce (3) that imposes an unreasonable restraint on trade. 54 Am. Jur. Monopolies and Restraints of Trade § 484; *see Cont'l Cablevison of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1118 (6th Cir. 1983) (stating the essential elements plaintiffs must prove to sustain a § 1 claim); *see also Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982). Element one requires evidence of "the terms and membership of the conspiracy and the method adopted to effectuate its ends." 54 Am. Jur. Monopolies § 484. Element two requires Plaintiffs define the relevant product market and relevant geographic market. *See Mich. Div.-Monument Builders of N. America*, 524 F.3d 726, 733 (6th Cir. 2008) (quoting *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001)). Element three requires showing the agreement had an anticompetitive effect. *See Richter Concrete Corp.*, 691 F.2d at 827. An anticompetitive effect can be shown using one of two analytical approaches: the *per se* rule and the rule of reason. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003) (citing *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998)).

Plaintiffs have pled the following facts in support of their antitrust allegations. Ky HBPA allied with THG in November 2007, thereby entering into an agreement with horsemen's groups at 40 other racetracks. (Am. Compl. ¶ ¶ 63-64.) The views of the group are

-25-

memorialized in a uniform Licensing Agreement that is attached to the complaint.  (Am. Compl. ¶ 65.)  Once signed by an ADW, the Licensing Agreement would dictate minimum prices for ADWs purchasing signals.  The presence of a tangible, and agreed upon, contract makes the existence of a combination or conspiracy amongst the horsemen plausible.

Plaintiffs define the relevant market as "the sale and licensing of the right to receive simulcast signals and to accept wagers on horse racing at locations other than the host racetrack."  (Am. Compl. ¶ 59.)  The relevant geographic market is the entire United States.  (Am. Compl. ¶ 59.)  These designations define where the buyers and sellers compete.  As such, these allegations present sufficient facts to meet the plausibility standard for element two.  Defendants strongly argue that this is the incorrect product market.  For purposes of this motion, however, the Court  accepts the market as pled.  The Court does recognize Defendants' concerns as to whether Defendants actually participate in that market.  The Court will discuss that question in Section VI of this Memorandum.

Plaintiffs' legal theory to support their claim of an antitrust violation is price-fixing effectuated by group boycotting.  They assert that, as a part of the THG alliance, Ky HBPA "agreed to the terms of a uniform Horsemen's Simulcast Licensing Agreement" that "provides that horsemen's groups must receive one-third of the takeout arising from the sale of signals."  (Am. Compl. ¶ 65.)  The Licensing Agreement requires any ADW to pay a minimum of 1/3 of the Takeout to any track horsemen's group that is a signatory THG member.  In this way, the horsemen's groups have allied to require that minimum fee.  These facts describe an agreement that plausibly sets a floor for the price of a signal.  Such an agreement is plausibly construed as price-fixing.

Plaintiffs offer the Licensing Agreement and Defendants' contemporaneous use of their horsemen's veto as evidence of the perpetrating group boycott.  Supporting facts include the KTA and Ky HBPA, as well as three other named horsemen's groups, appointing THG to negotiate with ADWs on their behalf and adopting a uniform agreement for signing by multiple horsemen's groups.  This suggests concerted action beyond independent or mere parallel action since one single entity is performing each members' tasks in negotiations.  They also assert that the Ky HBPA, the Pennsylvania HBPA, Florida HBPA, and the Texas Horsemen's Partnership have all stated in letters that they will not consent to the sale of the host track's signal unless the ADW has signed the Licensing Agreement.  (Am. Compl. ¶ 69.)  The Florida HBPA's disagreement with Calder, its host track, has led other THG members[24] to revoke consent for their track to simulcast its signal to Calder.  Plaintiffs further allege that "[t]he avowed goal of this concerted action by competing horsemen is to raise the prices paid to horsemen for signals." (Am. Compl. ¶ 65.)  These facts further illustrate a plausible finding of a group boycott to raise prices, which shows an anticompetitve effect.  All three elements of a § 1 violation claim are plausibly supported by facts alleged in the complaint.

## B.

For the individual defendants Hiles and Maline, Plaintiffs must show that the "corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."  *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986).  The Amended Complaint fails to provide facts that would support the plausibility of this claim.  It identifies Hiles as the President of the Ky HBPA, and Maline as the Executive Director of the Ky HBPA.

---

[24] This includes the Delaware THA, Ky HBPA, Maryland THA, and Ohio HBPA.  (Am. Compl. ¶ 70.)

Beyond this mere identification of the defendants' roles in the organizations, it provides no facts that suggest the role these individuals played in the decision making process.  Plaintiffs assert in conclusory language that these individual defendants "made a conscious commitment to the scheme to raise prices by directing the Kentucky HBPA and the KTA to appoint the THG as agent, and by requiring the Kentucky HBPA and the KTA to join the boycott of ADW operators."  (Am. Compl. ¶ 79.)  Plaintiffs provide no facts that support the required elements that the agents be "actively and knowingly" engaged in the scheme.  As such, Plaintiffs failed to plead in such a way as to create more than mere speculation of the individuals' involvement in the alleged conspiracy.[25]

Embedded in Defendants' *Twombly* arguments is a more fundamental question of whether the Amended Complaint actually alleges an antitrust cause of action.  The proceeding factual basis supports finding that Plaintiffs have alleged a plausible conspiracy against the horsemen's groups in a relevant market for the purpose of price-fixing.  The Court will separately address whether these facts, if true, may give rise to an antitrust violation.

## VI.

Both parties argue about whether these facts amount to an antitrust violation under either a *per se* or a rule of reason analysis.  Defendants' arguments question the viability of Plaintiffs' underlying claim.  Defendants argue that the facts, as presented in the complaint, cannot constitute a group boycott for the purpose price-fixing and thus Plaintiffs fail to assert either a *per se* or rule of reason violation.  Based upon its current understanding of this antitrust claim,

---

[25] The Court need not address Defendants' motion to dismiss on the grounds that Hiles and Maline are immune from antitrust liability under the Volunteer Protection Act since those defendants have been dismissed, pursuant to 12(b)(6) and *Twombly*, for failure to state a claim.

the Court has concluded that the facts as pled do support its plausibility.

The *per se* rule applies to "practices [that] by their nature have 'a substantial potential for impact on competition.'" *F.T.C. v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990). Once the Court determines that "a practice is illegal *per se*," it does not have to further examine "the practice's impact on the market or the procompetitive justifications for the practice" to find a violation. *Expert Masonry*, 440 F.3d at 342. As such, a *per se* violation only requires Plaintiffs prove three things:

> (1) two or more entities engaged in a conspiracy, combination, or contract, *Guzowski v. Hartman*, 969 F.2d 211, 214 (6th Cir.1992), (2) to effect a restraint or combination prohibited per se (wherein the anticompetitive effects within a relevant geographic and product market are implied), *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir.1982), (3) that was the proximate cause of the plaintiff's antitrust injury, *Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir.1994).

*Expert Masonry*, 440 F.3d at 342. Plaintiffs do not have to show power, intent or impact. *Id.* (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004)). The presumption, however, is against *per se* violations. *Expert Masonry*, 440 F.3d at 343.

Horizontal agreements, as alleged here, "involve direct competitors at a given level of the market ... [and] are viewed as especially injurious, and courts therefore bar them *per se*, regardless of any alleged ameliorative rationale." *Id.* at 344. Examples include price-fixing and group boycotts. *Id.* Commercially motivated group boycotts are *per se* violations because "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 294 (U.S. 1985). Such boycotts are "designed to 'pressure' another party into doing

something by 'withholding, or enlisting others to withhold, patronage or services from the target.'" WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 2:16 Group boycotts–In general (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541-43 (1978)).  Evidence of a group boycott used to effectuate a price-fixing arrangement is sufficient to support a *per se* violation.  *See Super. Ct. Trial Lawyers Ass'n*, 493 U.S. at 436 n.19; *see also* HOLMES § 2:16.

The rule of reason analysis "permits case-by-case evaluation of [the restraint's] effect on competition."  *Expert Masonry*, 440 F.3d at 342 (quoting *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991)).  The prima facie case under the rule of reason requires facts sufficient to prove:

> 1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989).  The defendant then has the burden "to 'come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries.'" *Expert Masonry*, 440 F.3d at 343 (citing *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 718).  Then, the plaintiff "must show that any legitimate objectives can be achieved in a substantially less restrictive manner."  *Id.* at 343 (citing *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 718).

Although the Court does not conclude whether the actions at issue are definitely a *per se* violation, the Court will discuss it.[26]  Defendants' primary contention is that the horsemen's

---

[26] The Court focuses on the *per se* analysis at this time given the pleadings and the Court's *Twombly* analysis.  Since a boycott for the purpose of price-fixing has consistently been held as a *per se* illegal horizontal agreement, the Court only addresses the viability of that contention.  If it proves unviable, the Court may perform a rule of reason analysis following discovery.

groups are not direct competitors at a given level of the market, and thus cannot be price-fixing. The complaint identifies the given market as the market for the sale of signals. The "signal" is the common term to describe what the ADW receives, which is the ability to accept wagers on races at tracks in other states. As part of the package Churchill provides video footage of the races; however, that is not exactly the product at issue in this case. The visual images are ancillary to that core product of off-track betting under the IHA legislative scheme.[27]

Given the market as pled, the question remains whether the horsemen's groups participate in the market for the right to accept wagers on off-track races, "the signal." At this point, it appears that they may do so. The tracks clearly compete with one another to get the best deal from an ADW. The IHA makes the horsemen's groups and the tracks joint sellers of the right. Though neither party independently owns the right to allow ADWs or OTBs to accept wagers on the race, the horsemen's groups do hold that property right jointly with the track. Though the horsemen's groups are not selling the end product, their actions may still fix or increase the price of that product in a way that restrains commerce. Such an arrangement, if true, seems to indicate that the horsemen's groups do participate as competitors in the market for signals.

The Licensing Agreement pressures the ADWs, as the target of the boycott, to pay a minimum price for any signal it receives from tracks with THG member local horsemen's groups. The THG member groups are collectively threatening all ADWs that they must contract with THG horsemen's groups according to a certain set of terms. The ultimate result is that if

---

[27] If Plaintiffs had pled a market for consent only, no anti-trust violation could exist. Since each horsemen's group can only give consent to their track, there is no market for consents. The horsemen's groups are not competitors in regards to giving their consent to the track because the horsemen's groups cannot offer their consent to different tracks for a different price.

the ADW does not assent to the Licensing Agreement, it is precluded from purchasing a signal from any track whose local horsemen's group participates in the THG scheme. Again, if true, this arrangement seems synonymous with previously identified *per se* violations.

There are many facts and economic relations as yet unknown that could influence this case. Plaintiffs' theory of an antitrust violation and injury may be quite difficult to establish in fact. Additional evidence may show that Plaintiffs are unable to support their allegations under either analytical approach: *per se* or rule of reason. At that time, the Court may more appropriately assess whether a violation has actually occurred.

## VII.

Ky HBPA has also moved for dismissal of Count II of the Amended Complaint, which alleges breach of both (1) the contract's anti-assignment provision[28] and (2) its exclusive representation provision. As a basis for the breach, the Amended Complaint cites the appointment of THG to negotiate a License Fee for the horsemen's groups with the ADWs. It says that appointing THG as an agent "directly conflicts" with the horsemen's groups' obligation to serve as exclusive representative for purposes of the IHA. For the following reasons, the Court finds no grounds for a breach of contract claim.

The exclusive representation provision reads: "with respect to the matters set forth herein during the Term of this Agreement, the Ky HBPA shall be the exclusive representative of its members." The Court will strictly enforce the terms of an unambiguous contract. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Where a contract is susceptible to inconsistent interpretations, an ambiguity exists. *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 905

---

[28] Plaintiffs concede Defendants have not violated the anti-assignment provision by their own admission in their response brief. The Court will therefore dismiss any claim for breach of the anti-assignment contract provision.

(Ky. App. 1994).  The Court interprets the provision according to the intention of the parties as demonstrated by "the language used, the subject matter, and the purpose of the contract."  *D.L Walker & Co. v. Lewis*, 101 S.W.2d 685, 687 (Ky. App. 1937).  The parties agree that the exclusive representation provision does not prohibit the horsemen's group from appointing an agent to negotiate on its behalf.  The Court's analysis must proceed by determining the nature of the relationship at issue and its relation to the contract terms.

The Court interprets the exclusive representation language in light of the contract's purpose. The focus of the contract is revenue distribution according to the purpose and terms of the IHA.  As such the IHA impacts the scope and effect of the provision.  The IHA defines horsemen's group in relation to a particular racetrack.  15 U.S.C. § 3002 (12).  As such, the IHA requires the local horsemen's group consent to any off-track betting.  15 U.S.C. § 3004.  The contract provision provides that the local horsemen's group must be the exclusive representative of the horsemen for the purpose of consenting.

The crux of the analysis is determining whether THG's actions constitute only an agency relationship.  Both parties agree that the local horsemen's groups can appoint an agent to advise, consult, or represent the groups during negotiations.  "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  *McAlister v. Whitford*, 365 S.W.2d 317, 319 (Ky. 1962).  In an agency relationship, the principal retains control.  *Louisville Ry. Co. v. Louisville Area Transp. Workers Union*, 228 S.W.2d 652, 654 (1950).

Plaintiffs' own allegation asserts that the Ky HBPA breached the contract by appointing "the THG to act as their ***agent*** to negotiate a license fee for the sale of Churchill Downs' signals

-33-

to ADWs."  (Am. Compl. ¶ 89.) (emphasis added).  Not only do the Plaintiffs identify the

relationship as an agency relationship, but the allegations support such a finding.  THG is

carrying out Ky HBPA's, the principal, interests.  The local horsemen's groups have asserted the

horsemen's veto themselves, THG has not exercised the veto on Ky HBPA's behalf.  THG has

no authority to decide when Ky HBPA may enter into a contract over interstate off-track

wagering rights or when to consent to the sale of Churchill's interstate simulcast signal – and the

complaint never alleges facts to the contrary.  Any participation THG has in the negotiation

process is in an agency capacity on behalf of the principal in furtherance of its specified

interests.       Further, THG's negotiations for a License Fee are between it and the ADWs

themselves.  Such negotiations seem outside the purview of the contracts' provisions.  Even if

the contract extends to such negotiations, THG remains in its agent role.  Therefore, the

exclusive representation provision is not violated because Ky HBPA has only appointed an agent

to participate in the negotiations.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record